## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**SONIA MARTINEZ**,
     Petitioner,

     v.

**COMMISSIONER OF SOCIAL SECURITY**,
     Defendant.

Civil No. 19-1364 (BJM)

### OPINION AND ORDER

Sonia Martinez ("Martinez") seeks review of the Social Security Administration Commissioner's ("the Commissioner's") finding that she is not entitled to disability benefits under the Social Security Act ("the Act"), 42 U.S.C. § 423. Martinez contends that the administrative law judge ("ALJ") erred in finding that her mental impairment does not meet Listing 12.04, in assessing her residual functional capacity ("RFC"), in considering her subjective statements about her symptoms, and in finding that there were a significant number of jobs in the national economy that she could perform. Docket No. ("Dkt.") 17. The Commissioner opposed. Dkt. 22. This case is before me by consent of the parties. Dkt. 5, 6. For the reasons set forth below, the Commissioner's decision is **VACATED** and **REMANDED**.

### STANDARD OF REVIEW

After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and his delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C.§ 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). Substantial evidence

means "'more than a mere scintilla.' . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)) (internal citation omitted). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

The Commissioner employs a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6-7 (1st Cir. 1982). At step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is

conclusively presumed to be disabled. If not, the evaluation proceeds to the fourth step, through which the ALJ assesses the claimant's RFC and determines whether the impairments prevent the claimant from doing the work he has performed in the past.

An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform this work, the fifth and final step asks whether the claimant can perform other work available in the national economy in view of his RFC, as well as age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Martinez v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant has done this, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989).

Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following facts are drawn from the transcript ("Tr.") of the record of proceedings.

Martinez was born on February 10, 1960. Tr. 457. She completed two years of college and began working as a collections assistant with the Puerto Rico Treasury Department, where she worked for over thirty years. Tr. 83, 137, 461. Over time, she developed depression, abdominal pain, neck pain, and other ailments. Tr. 56, 169,460, 762. Her mental conditions developed while she was working, and she reported that there were times when she was reprimanded at work because of them. Tr. 94. In October 2013, she retired. Tr. 83, 137.

On September 9, 2014, Martinez applied for disability benefits, claiming an onset date of January 9, 2014. Tr. 56, 460. The Commissioner denied Martinez's claim initially, on

reconsideration, and after a hearing before an ALJ. Tr. 56. The record before the Commissioner, which included medical evidence and Martinez's self-reports, is summarized below.

In a function report dated October 9, 2014, Martinez reported that she could no longer work because she could not concentrate, would forget basic things, was always crying, and feared driving and the unknown. Tr. 129-30. Martinez reported limitations related to memory, completing tasks, concentration, understanding, following instructions, and getting along with others. Tr. 134. She did not report physical limitations except that she could walk twenty minutes before she would need to stop, and she would need to rest thirty minutes before resuming. Tr. 134. Martinez explained that she awoke every day without motivation, lacked interest in how she looked, did not care for others, and avoided authority figures. Tr. 130, 135. She lacked motivation to take care of personal needs, and her companion helped her remember her medications. Tr. 131. She did not prepare meals because she could not concentrate, and she did not feel like doing household work. Tr. 131-32. Nor did she like leaving the home, so her companion handled the shopping. Tr. 132. She reported no hobbies, no social life, and an inability to handle money. Tr. 132-33.

Martinez sought psychiatric treatment with Dr. Edgardo Prieto Agostini ("Dr. Prieto") from January 2014 to August 2017. She was diagnosed with major depression, recurrent, severe, and treated with psychotherapy and pharmacotherapy, including prescriptions for Brintellix and Ambien. Tr. 149-50. Dr. Prieto's treatment notes show that Martinez was frequently disheveled, depressed, anxious, and angry; that she had concentration, attention, and memory deficits; and that her insight and judgment were poor. *See, e.g.*, Tr. 265, 340. She was regularly stable, though her symptoms did not improve. *Id.* Martinez was generally oriented and cooperative with normal speech and good reliability, but her motor activity was often retarded. *See, e.g.*, Tr. 266. She was generally without perceptual disturbances and suicidal ideas. *Id.*

From October 21 to October 27, 2014, Martinez participated in a partial hospitalization program that provided intensive outpatient treatment for depression. Tr. 153. She was diagnosed with major depression, severe, recurrent; treated with pharmacotherapy and psychotherapy; and

assigned a GAF of 40-50.[1] Tr. 153-54. Martinez's response to treatment was good. Tr. 154. Through occupational therapy, she increased her periods of attention and concentration, recognized alternatives to improve communication, achieved socializing with greater frequency, identified free time activities, and achieved tolerance in group activities. Tr. 155. However, at discharge, the clinical prognosis was poor, and she was advised to continue with psychiatric treatment. Tr. 154.

On October 22, 2014, Dr. Prieto prepared a psychiatric report. Tr. 147. Dr. Prieto explained that Martinez sought his care in January 2014 because of numerous symptoms, including constant worry, nervousness, irritability, tension, a sensation of finding herself in a sleep-like state, fear of losing control, restlessness, excitement with nerves on edge, dizziness/light-headedness, insomnia, agitation, fatigue, difficulty concentrating, a sensation of impotence, decreased appetite, sadness most of the day, frequent crying, a sensation of not being worth anything, hopelessness, anhedonia,

---

[1] "GAF is a scale from 0 to 100 used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults.'" *Hernández v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 202, 206 f.n. 1 (D.P.R. 2013) (quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) (hereinafter "DSM–IV")). The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale. DSM-IV at 32–34. A GAF rating of 21 to 30 indicates behavior considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or inability to function in almost all areas. *Id.* at 34. A GAF rating of 31 to 40 indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.* A GAF rating of 41 to 50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.*

"[D]ue to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed, the [American Psychiatric Association] abandoned the GAF score in its recently published fifth edition of the Diagnostic and Statistical Manual of Mental Disorders." *Bourinot v. Colvin*, 95 F. Supp. 3d 161, 178 (D. Mass. 2015) (internal quotation marks and citation omitted).

In July 2013, the Commissioner issued Administrative Message (AM)-13066, revised effective October 14, 2014, providing its adjudicators, including ALJs, with internal guidance regarding the interpretation of GAF ratings. AM-13066 acknowledged that the American Psychiatric Association eliminated the use of GAF ratings but confirmed that adjudicators will continue to consider GAF ratings as opinion evidence. As with other opinion evidence, however, a GAF rating needs supporting evidence to be given much weight. According to AM-13066, "the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise." The Commissioner cautions that a GAF rating "is never dispositive of impairment severity," and an ALJ should "not give controlling weight to a GAF [rating] from a treating source unless it is well[-]supported and not inconsistent with the other evidence."

a decrease in sexual desire, a sensation that life is not worth living, memory problems, frequent negative thoughts, difficulty making decisions, fear of doing something uncontrollable, chills, constant anxiety, anger, poor impulse control, recurrent non-structured ideas of suicide, pessimistic thoughts, feelings of guilt, impotence, and frustration, low self-esteem, distancing herself from friends and neighbors, and episodes of explosive behavior towards family members, coworkers, and friends. *Id.* Dr. Prieto reported that Martinez's emotional condition was severe and chronic and that it had deteriorated, which prevented her from working. Tr. 148. At her most recent visit, Martinez was alert, oriented, and communicative with good visual contact and paused but spontaneous speech. *Id.* However, she showed signs of retarded psychomotor activity, depressed thought content, low self-worth, hopelessness, pessimism, feelings of frustration, and anger, and non-structured ideas of suicide. *Id.* She did not report perceptual disorders. *Id.* Dr. Prieto also explained that Martinez had an extremely short attention span, difficulty concentrating, and diminished immediate and short-term memory—she could only remember and repeat two of five words. Tr. 149. Her recent and remote memory were also affected. *Id.* Moreover, Martinez was under a doctor's order not to drive due to the effects of medication and altered attention and concentration. Tr. 148. Although her intellectual functioning was appropriate to her education, her judgment and insight were poor. Tr. 149.

Dr. Prieto also opined that Martinez's condition affects her ability to perform daily activities and that her ability to stay at home without supervision is poor. *Id.* He found that Martinez has poor tolerance for taking turns, poor decision-making ability, and a tendency toward isolation. *Id.* When faced with situations of daily living, she responds with severe fear and anxiety. *Id.* He also found that Martinez does not persist at goals or tasks, as she suffers from poor motivation, impulsiveness, and anhedonia, as well as deteriorated attention, memory, and concentration. *Id.* Her ability to react and adapt herself to work was affected, her social and professional interaction reduced, and her motivation to work poor. Tr. 150. Although she retained the ability to understand and carry out simple instructions, her ability to follow complex instructions was reduced. *Id.* Dr. Prieto also reported that Martinez's motivation to maintain an adequate personal appearance was

reduced, her ability to act in a predictable manner under moderate tension in a work environment compromised, and her trustworthiness and productivity as an employee severely reduced. *Id.* Further, the increase in her crisis episodes affected her ability to make decisions. *Id.* Dr. Prieto found that Martinez's prognosis was poor and assigned her a GAF of 40, though her GAF in the last year had been 70. Tr. 149-50. Due to the severity of her symptoms, she had been referred for psychiatric hospitalization, and she required permanent psychiatric treatment. Tr. 149. Nonetheless, she could handle her finances. Tr. 151.

Dr. Prieto affirmed these findings in reports dated May 6, 2015 and August 18, 2017, though by August 2017 Martinez's judgment and insight were good. Tr. 204, 345.

On December 13, 2014, Martinez visited Dr. Pedro González Vega ("Dr. González"), a psychologist, for a consultative examination. Tr. 157. Martinez informed Dr. González that she was suffering from symptoms of anxiety, sadness, crying, social isolation, insomnia, irritability, memory problems, and difficulty concentrating. Tr. 158-59. Although she takes several medications, she reported that she was not getting better. *Id.* She stated that she lived with her husband and son and that she could care for her personal hygiene, dress herself, and prepare basic food, but she could not do must household chores. Tr. 160. She spent her time laying down in her room, and her husband reminded her to take her medications. Tr. 159. Martinez informed Dr. González that she would go to church every once in a while at her husband's urging, and she could drive to appointments accompanied by her husband. Tr. 160. Her social interaction involved family conflict. *Id.* Dr. González observed that, although Martinez appeared frustrated when discussing her symptoms, she mostly maintained a conversation, making appropriate eye contact just occasionally but crying during the interview. Tr. 159, 161. She answered all of Dr. González's questions and used relevant, coherent speech, speaking at a slow pace with low tone of voice. Tr. 161. Dr. González noted Martinez's history of suicidal ideation, but Martinez denied suicidal or homicidal thoughts. Tr. 158. He recorded no psychotic ideation and no hallucinations. *Id.* Martinez presented with a depressed mood and consistent affect. Tr. 161. Her immediate, short-term, and recent memory were slightly diminished and her long-term memory adequate. *Id.* Her attention

and concentration were also slightly diminished. Tr. 162. Martinez's intellectual ability was average, and she successfully answered questions testing her general knowledge. *Id.* Her interpretation capabilities, arithmetic abilities, and social judgment were adequate, while her immediate insight was poor. *Id.* Dr. González diagnosed Martinez with major depressive disorder, recurrent, severe, and assigned a GAF of 65. Tr. 163. He found that Martinez could perform some basic daily activities but needs moderate help from family members. *Id.* He opined that she struggles on tasks that demand moderate to high levels of memory and concentration and found Martinez competent to handle her funds. *Id.*

On February 12, 2015, non-examining state agency psychologist Dr. Jennifer Cortes ("Dr. Cortes") reviewed the record, including Dr. González's examination, Dr. Prieto's October 2014 report, and Martinez's intensive outpatient program records. Tr. 351-57. Dr. Cortes considered a former version of Listing 12.04 as well as the former paragraph B criteria, finding that Martinez had moderate limitations in the following areas: activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace. Tr. 356. She had no repeated episodes of decompensation, each of extended duration. *Id.* Dr. Cortes also found that Martinez was not significantly limited in most areas of mental functioning. Tr. 358-39. Although she could remember and understand simple instructions and procedures, she was moderately limited in her ability to remember more detailed instructions. Tr. 358. Dr. Cortes also reported moderate limitations in the following areas: the ability to maintain attention and concentration for extended periods; to interact with the general public; and to respond appropriately to changes in the work setting. Tr. 358-60. Dr. Cortes opined that Martinez could understand, remember, and execute simple one- or two-step instructions; follow simple work procedures; make simple work-related decisions; maintain attention up to two hours at a time; sustain concentration, persistence, and pace; adapt to changes; maintain a regular schedule; use transportation; and interact adequately with others. Tr. 359-60. On June 19, 2015, non-examining state agency psychologist Dr. Annette Paz-Ortiz ("Dr. Paz") affirmed these findings. Tr. 370-74.

From September 9 to September 15, 2015, Martinez participated in a partial hospitalization program for symptoms of depression and anxiety at the Center for Access and Treatment. Tr. 95, 208-11, 213-17. Doctors indicated that her symptoms interfered with her social and family functioning but did not mark boxes indicating that they interfered with her work and academic functioning. Tr. 209. At discharge, she had reached maximum benefit from partial treatment, having achieved significant improvement. *Id.* She was alert, active, oriented, logical, coherent, relevant, and in contact with reality. Tr. 208, 213. Her mood and affect were improved, and she had gained better judgment and insight about her condition. Tr. 208. Martinez was without delusions, perceptual disorders, or plans of suicide and homicide. *Id.* She could verbalize goals, future plans, and reasons for living. Tr. 208. Doctors changed her medications from Brintellix and Ambien to Prosom for sleep and Zoloft for depression. *Id.* On September 29, Dr. Prieto noted that Martinez had been partially hospitalized with good response to treatment. Tr. 253.

From November 2015 to December 2016, Martinez sought mental health treatment at Inspira. Tr. 273, 295. At her initial appointment, Martinez reported symptoms of deep sadness, frequent crying, anhedonia, excessive sleep, excessive expenses, and excessive restlessness. Tr. 273. Mental exam notes show that Martinez's appearance was good, speech clear, and thoughts relevant, coherent, and logical. Tr. 274. Her behavior was hypoactive and affect sad. Tr. 274. She had no changes in her immediate, intermediate, or remote memory, and her judgment was adequate. Tr. 274. However, her insight was poor and thought content showed excessive worry. Tr. 274. She had no perceptual disturbances or ideas of suicide or homicide. Tr. 273-74. At subsequent appointments, Martinez was generally cooperative, oriented, relevant, coherent, and logical, with good hygiene, adequate judgment, no memory changes, and adequate concentration. Tr. 270, 272, 295, 297, 299. Her insight was sometimes adequate, Tr. 271, 272, 297, 299, but other times superficial or poor, Tr. 270, 274, 295. With occasional exception, Tr. 297, she reported ongoing symptoms of sadness, anhedonia, irritability, excessive anxiety, and insomnia, among others. *See, e.g.*, Tr. 272. The areas of her life impacted by her symptoms included relationships with her partner, medical conditions, daily household activities, and social life. Tr. 271, 273. On December

16, 2016, Martinez reported that she was "well . . . more or less," though her mood was depressed and anxious, she was worried about situations of daily living, and she showed verbal aggression. Tr. 295.

The record also contains evidence of various physical ailments. From July 2014 to August 2017, Martinez sought treatment with her primary care physician, Dr. Vianny Nieves ("Dr. Nieves") for several conditions, including abdominal or pelvic mass, hyperlipidemia, hypertension, insomnia, major depressive disorder, muscle spasm, constipation, and irregular menstrual cycle. Tr. 166, 178. At her initial visit, Dr. Nieves prescribed Amlodipine, Carvedilol, Lisinopril, and Naproxen. Tr. 167.

On August 6, 2014, Martinez reported abdominal pain, and Dr. Nieves ordered an abdominal-pelvic sonogram, Tr. 169, which showed fatty liver and right lower quadrant mass or complex cyst. Tr. 171. On November 7, Martinez underwent a total abdominal hysterectomy and bilateral salpingoophorectomy to address the large uterine mass. Tr. 240, 607-09. The final diagnosis was large pedunculated uterine myoma with a secondary diagnosis of multiple pelvic adhesions. Tr. 240. She was discharged on November 10 with good initial post-operative recovery. Tr. 240, 609. However, during December visits to Dr. Nieves, she reported constipation and stomach pain that occasionally runs to the leg. Tr. 176, 179. Dr. Nieves ordered an x-ray of Martinez's kidney, ureter, and bladder, which showed constipation and osteoarthritis, and prescribed Caltrate, Glucosamine, Chondrontin, and Omeprazole. Tr. 179-81.

On February 5, 2015, Martinez reported palpitations, and Dr. Nieves referred her to a cardiologist in addition to ordering a mammography, sonomammography, and routine colonoscopy. Tr. 183. Mammography results were normal. Tr. 192. The colonoscopy showed internal hemorrhoids, and a lactose test showed lactose intolerance. Tr. 195-96, 246. Dr. Nieves recommended a lactose free, high fiber diet, and insisted that Martinez drink water. Tr. 196. He also prescribed Miralax and Gaviscon. Tr. 196.

On March 3, 2015, non-examining state agency physician Dr. Jose González-Mendez ("Dr. González-Mendez") reviewed the record. Tr. 355. Dr. González-Mendez noted that Martinez had

a history of hypertension and hyperlipidemia and observed that treatment notes did not show evidence of major cardiovascular complications or organ damage. Tr. 355. He also noted that Martinez's function report did not allege limitations in her ability to stand, walk, lift, sit, or perform postural movements. Tr. 355. He thus opined that Martinez's medical conditions did not cause more than minimal limitation in functioning. Tr. 355.

On July 2, non-examining state agency physician Dr. Jose Rabelo ("Dr. Rabelo") reviewed the record. Tr. 369. He noted that Martinez had hypertension and a history of hyperlipidemia but also observed that the record lacked evidence of end organ damage or multiple hospital admissions secondary to hypertension. Tr. 369. Dr. Rabelo determined that Martinez did not have any physical restrictions. Tr. 369.

A February 2016 colonoscopy showed non-bleeding diverticula, melanosis, internal hemorrhoids, and two sessile non-bleeding polyps. Tr. 279, 282. The polyps were removed. Tr. 279. Martinez was advised to avoid aspirin and NSAIDS, drink water, maintain a high fiber diet, take Citrucel and Colace with meals, and schedule a follow-up appointment. Tr. 279.

On March 23, 2016, an abdominal-pelvic computerized tomography ("CT") scan showed right lower quadrant anterior abdominal wall defect with herniated small bowel loops; nonspecific colonic wall thickening of the splenic flexure accentuated by underdistension; small hiatal hernia; mild spondylosis; status post hysterectomy; and bibasilar subsegmental atelectatic changes. Tr. 605-06. A June 2016 pelvic ultrasound showed a right lower quadrant anterior abdominal wall hernia. Tr. 660. A June 2016 bone scan showed normal bone densitometry. Tr. 654.

On October 4, 2016, Martinez was diagnosed with ventral incisional hernia, and she underwent a ventral hernia repair. Tr. 664, 701-04. The wound was classified as clean, Tr. 702, but later that month, it became infected, Tr. 302. She went to the the emergency room with erythema, suppuration, and acute pain in the abdomen. Tr. 302, 719. She was discharged to home, ambulatory, with oral Bactrim. Tr. 302-11, 714. She was stable at discharge. *Id.*

November 2016 x-rays of Martinez's feet showed osteoarthritis and mild left hammertoe deformities. Tr. 662. X-rays of Martinez's hands and wrists showed osteoarthritis and mild bilateral

negative ulnar variance. Tr. 663. A tissue examination report dated November 4, 2016 revealed an abdominal wall herniorrhaphy and hernia sac. Tr. 664.

In May 2017, a thyroid ultrasound showed a small cyst in the right aspect of the isthmus and a mildly enlarged right thyroid lobe. Tr. 316, 727.

On August 8, 2017, a cervical spine x-ray showed muscle spasm, osteoarthritis, and discogenic disease. Tr. 754. A lumbar spine x-ray showed mild osteoarthritis. Tr. 755. Dr. Nieves prescribed Baclofen. Tr. 756. On August 12, Martinez visited Dr. Luis Sánchez Colón to consult with a physiatrist about some kind of spasm. Tr. 349. She was referred to physical therapy for neck and upper trapezius pain, to be repeated every three weeks for a total of eight sessions. Tr. 762. Therapy included ultrasound, hot packs, massage, cervical exercises, neck flexion and extension stretches, myofascial release, and twenty minutes of electrical stimulation on the upper trapezius. *Id.* The diagnosis was neck pain and myofascial pain syndrome. *Id.* Martinez was prescribed Relafen and Flexeril. Tr. 763.

On September 1, 2017, Martinez appeared for a hearing before an ALJ. Tr. 77. She testified that she had high blood pressure, bowel discomfort all the time, pain whenever she eats, chronic constipation, lactose intolerance, variable appetite, and trouble sleeping. Tr. 85-86, 91. She also reported pain in her chest that she gets if she does not take a pill daily, pain down the leg, constant hip pain, and horrible back pain all the time. Tr. 85-88. She could stand for five minutes, walk for ten minutes, and stay seated for ten minutes but would need to change positions. Tr. 89. She could use her hands and fingers, but her hand strength was diminished. Tr. 89-90. She also testified that it hurt her to write and raise her arms above the shoulders, and she had just begun physical therapy. Tr. 88, 90. Additionally, she could not focus, follow instructions, or remember things, and she did not get along with others, as she would become angry and irritable. Tr. 92-93. She also reported that she saw things during the day, thought about hurting herself or others, and had considered taking her own life. Tr. 91, 94. When she is with other people, she would become annoyed and yell. Tr. 93. Noise made her lose control. Tr. 96. Martinez also explained that, although she took medication for her symptoms, they did not help. Tr. 88, 96. She spent her time laying down at

home, where her daughter or someone else would help care for personal needs. Tr. 97. She did not

do housework and required reminders to shower. Tr. 98. She did not leave the house alone, and her

son took her to appointments. Tr. 99.

The ALJ announced his decision on January 18, 2018. He determined that Martinez had

not engaged in substantial gainful activity since January 9, 2014 (her alleged onset date) and that

she was insured through December 31, 2018. Tr. 58. Next, he found that she suffered from one

severe impairment: depression. Tr. 58. He found that Martinez's hyperlipidemia, muscle spasms,

gastrointestinal or abdominal swelling, diverticulosis, internal hemorrhoids, and neck and upper

trapezius pain were not severe. *Id.* At step three, the ALJ considered whether Martinez's depression

met or equaled Listing 12.04. In considering the paragraph B criteria, the ALJ determined that

Martinez had moderate limitation both in understanding, remembering, or applying information

and in maintaining concentration, persistence, and pace. Tr. 59-61. He reasoned that this was the

case because Martinez could provide appropriate and relevant information during her testimony

and because various mental status examinations showed intact cognitive functioning. Tr. 59.

Nonetheless, she had moderate limitation in these areas because at times her attention and

concentration were diminished, she had poor judgment, she reported forgetting things and lacking

concentration, and she had some difficulty performing activities of daily living. *Id.* The ALJ also

determined that Martinez had mild limitation in interacting with others, as she acted appropriately

during the hearing, lived with her son, and treatment records showed that she was generally

cooperative. Tr. 60. The ALJ also found that Martinez had mild limitation in adapting or managing

herself, as exams showed that she was often well-groomed, and the consultative examiner reported

that Martinez could handle her personal hygiene, prepare basic food, and dress herself. Tr. 61.

Because her condition met neither the paragraph B nor C criteria of Listing 12.04, the ALJ

concluded that Martinez's conditions did not meet or equal a listing.

Next, the ALJ determined that Martinez had the RFC to perform a full range of work at all

exertional levels with the following non-exertional limitations: she could understand, remember,

and execute simple one- or two-step instructions; maintain attention; sustain concentration,

persistence, and pace; adapt to changes; and interact adequately with others. Tr. 62. In reaching

this conclusion, the ALJ credited the type of symptoms Martinez reported but not the severity she

alleged. Tr. 63. He considered treatment records, diagnostic findings, the consultative examination,

and opinion evidence. Tr. 62-67. As to the evidence of Martinez's mental impairment, the ALJ

gave great weight to the opinions of the state agency consultants, as well as the records from Inspira

and the consultative examination. Tr. 66-67. He gave little weight to Dr. Prieto's opinion,

explaining that, although Dr. Prieto frequently recorded serious findings, Inspira records and the

consultative examiner indicated that Martinez can use reason and judgment to make work-related

decisions and that she could perform simple one- or two-step instructions. Tr. 64-65, 67. As to the

evidence of physical impairments, the ALJ reasoned that Martinez was physically unrestricted

because records from Dr. Nieves consistently showed vital signs within normal limits and did not

provide range of motion findings, sensory findings, motor strength findings, or deep tendon reflex

findings to support a disabling impairment; state agency consultants opined that Martinez did not

have a medically determinable impairment or any physical limitations; and diagnostic findings did

not show any significant condition to support a severe medically determinable impairment. Tr. 63-

64, 67.

Next, the ALJ found that Martinez could not perform her past work as a pay clerk because

her RFC precluded her from performing skilled work. Tr. 68. He nonetheless found Martinez not

disabled based on section 204 of the Medical-Vocational Guidelines. Tr. 69.

The Appeals Council denied review, Tr. 1, and this action followed.

## DISCUSSION

Martinez argues that the Commissioner's decision fails because (1) her mental impairment

meets Listing 12.04, (2) the ALJ's RFC determination is unsupported in light of the weight

assigned the non-examining state agency physicians' opinions, (3) the ALJ erred in assessing her

subjective complaints because he failed to apply the *Avery* factors, and (4) the ALJ failed to meet

his burden at step five. The Commissioner maintains that substantial evidence supports the ALJ's

decision, as the ALJ properly resolved conflicting evidence, weighed medical opinions, addressed

Martinez's subjective complaints, and supported his step five finding under section 204 of the Medical-Vocational Guidelines. I will address each of Martinez's arguments in turn.

To meet a listing, an impairment must meet all the medical criteria of the listing; an impairment that manifests only some of those criteria, no matter how severely, does not qualify. *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990). To meet or equal Listing 12.04, which governs depressive, bipolar, and related disorders, a claimant must satisfy the criteria in 12.04(A) & (B), or 12.04(A) & (C).[2] 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.04. Here, Martinez has challenged only the ALJ's decision as it relates to paragraph B.

To satisfy the paragraph B criteria, a claimant's disorder must result in an extreme limitation of one area, or marked restrictions in two of the following areas:

1. Understand, remember, or apply information;

2. Interact with others;

3. Concentrate, persist, or maintain pace; and/or

4. Adapt or manage oneself.

20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.04. A claimant has "mild limitation" if his or her "functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited." *Id.* at 12.00. A claimant has a "moderate limitation" if his functioning is "fair." *Id.* "Marked limitation" means a claimant's functioning is "seriously limited." *Id.* And "extreme limitation" means a claimant cannot function in an area "on a sustained basis." *Id.*

Here, the ALJ determined that Martinez had moderate limitations in (B)(1) understanding, remembering, or applying information and (B)(3) maintaining concentration, persistence, and pace. Tr. 59-61. She had mild limitations in (B)(2) interacting with others and (B)(4) adapting or managing herself. These findings are supported by the opinions of consultative examiner Dr. González, non-examining psychologists Dr. Cortes and Paz, and Inspira treatment records.

---

[2] The Commissioner revised Listing 12.04 in 2016, and these revisions became effective on January 17, 2017 for any pending claims. *See* Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66139 (Sept. 26, 2016). Therefore, the revised listings applied when the ALJ issued his decision on January 18, 2018.

Dr. González found that Martinez had average intellectual ability; that she could successfully answer questions testing her general knowledge; that Martinez's interpretation capabilities and arithmetic abilities were adequate; that she was able to maintain a conversation; that her long-term memory was adequate; and that her immediate, short-term, and recent memory were slightly diminished. Tr. 159-62. He also assigned a GAF of 65, indicating some mild symptoms or some difficulty in social, occupational, or school functioning. DSM-IV at 34. Drs. Cortes and Paz found that Martinez was not significantly limited in most areas of mental functioning and that she could remember and understand simple instructions and procedures, though she was moderately limited in her ability to remember more detailed instructions. Tr. 358-60, 370-74. Likewise, she could understand, remember, and execute simple one- or two-step instructions and follow simple work procedures. *Id.* Additionally, although treatment records from Inspira regularly show that Martinez was anxious and depressed, they also indicate that she was generally oriented, relevant, coherent, and logical, with adequate judgment and no memory changes. Tr. 270, 272, 274, 295, 297, 299. All this evidence supports the ALJ's determination of moderate limitation—that is, fair functioning—in Martinez's ability to understand, remember, or apply information.

Similarly, the ALJ's finding that Martinez did not have marked limitation in interacting with others is supported by treatment records showing that Martinez was cooperative, Tr. 250-67, 270, 295, 297, 299, 340-42, Dr. González's opinion that Martinez's social judgment was adequate, Tr, 162, and Dr. Cortes's and Dr. Paz's opinions that Martinez could interact appropriately with co-workers and supervisors, Tr. 359, 373. The ALJ's finding of moderate limitation in maintaining concentration, persistence, and pace is supported by Inspira records showing that Martinez was oriented, relevant, coherent, and logical, with adequate concentration, Tr. 270, 272, 295, 299; Dr. González's finding that Martinez's attention and concentration were slightly diminished, Tr. 162; and Dr. Cortes's and Dr. Paz's opinions that Martinez could maintain attention up to two hours at a time and sustain concentration, persistence, and pace, Tr. 359, 373. And the ALJ's finding of mild limitation in Martinez's ability to adapt or manage herself is supported by treatment records

showing that Martinez generally had adequate judgment and good hygiene, Tr. 270, 272, 295, 299, Martinez's report to Dr. González that she can care for her personal hygiene, dress herself, and prepare basic food, Tr. 160, and Dr. Cortes's and Dr. Paz's opinions that Martinez could maintain a regular schedule and adapt to change, Tr. 359-60, 370. Additionally, the ALJ relied on his own observations of Martinez's conduct during the hearing to support his paragraph B findings, which is permissible under the Commissioner's regulations. *See* Social Security Ruling ("SSR"), SSR 16–3p, 82 Fed. Reg. 49462 (Oct. 25, 2017) ("The adjudicator will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file.").

Of course, other portions of the record, particularly Dr. Prieto's findings and Martinez's self-reports,[3] could have supported a more severe limitation in at least some of the paragraph B criteria. Dr. Prieto opined that Martinez had an extremely short attention span, difficulty concentrating, diminished immediate and short-term memory, and poor insight and judgment. Tr. 148-49. Indeed, her attention and concentration were so affected that Dr. Prieto ordered her not to drive. Tr. 148. He also found that Martinez had poor ability to stay home without supervision, poor tolerance for taking turns, poor decision-making ability, and a tendency toward isolation. Tr. 149. Further, he reported limitations in Martinez's ability to persist at goals or tasks, react and adapt at work, follow complex instructions, maintain adequate personal appearance, act in a predictable manner, and serve as a trustworthy employee. Tr. 149-51; *but see id.* (explaining that Martinez could understand and carry out simple instructions and manage her finances). Moreover, Dr. Prieto assigned a GAF of 40, indicating some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. DSM-IV at 34. Had the ALJ given great weight to Dr. Prieto's opinion, a more restrictive paragraph B finding likely would have been appropriate.

---

[3] For reasons explained below, I find no error in the ALJ's decision to disbelieve the severity of mental symptoms Martinez alleged.

The relevant question, however, is not whether the ALJ could have found marked or extreme limitations in the paragraph B areas, but whether the ALJ's paragraph B findings are supported by substantial evidence. *Evangelista*, 826 F.2d at 144 (quoting *Rodriguez Pagan v. Secr'y of Health and Human Servs.*, 819 F.2d 1, 3 (1st Cir. 1987)) ("'[E]ven if the record arguably could justify a different conclusion,'" the court must affirm "'so long as [the Commissioner's decision] is supported by substantial evidence.'"). Here, those findings are supported by the evidence from Inspira (a treating source), Dr. González, and the non-examining psychologists. In assigning greater weight to these sources and little weight to the opinion of Dr. Prieto, the ALJ was merely carrying out his duty to weigh opinion evidence and resolve conflicts in the evidence. *See Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001) ("[T]he responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ."). In short, substantial evidence supports the ALJ's determination that Martinez's mental impairment does not meet or equal Listing 12.04.

Next, Martinez argues that the ALJ's RFC finding is not supported by substantial evidence because the ALJ improperly weighed the opinions of the non-examining state agency consultants and should have found greater limitations based on treatment records.[4] The Commissioner maintains that the ALJ's RFC finding is well-supported by the opinion evidence, largely normal treatment records, and an appropriate treatment of Martinez's self-reports.

When an ALJ reaches step five of the sequential evaluation process, the burden of proof shifts to the Commissioner to show that a claimant can perform work other than his past relevant work. *Ortiz*, 890 F.2d at 524. The record must contain positive evidence to support the

---

[4] In challenging the ALJ's RFC finding, Martinez cites evidence that was submitted to the Appeals Council. Dkt. 17 at 14. I do not consider this evidence because evidence submitted to the Appeals Council but not to the ALJ is not considered in evaluating the ALJ's decision. *LeBlanc v. Halter*, 22 F. App'x 28, 29 (1st Cir. 2001). The transcript does not make clear whether the rehabilitation note at Tr. 76 was submitted to the ALJ or only to the Appeals Council. It appears that said note went to the ALJ but was not included in the index of exhibits. *See* Tr. 70-74. I do not consider this document in the review that follows, noting only that the ALJ may consider it, alongside any other relevant evidence, on remand.

Commissioner's findings regarding the plaintiff's RFC to perform such other work. *See Rosado v. Secretary of Health & Human Servs*., 807 F.2d 292, 294 (1st Cir. 1986).

RFC is the most a claimant can do despite his or her limitations. 20 C.F.R. § 416.945(a)(1). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). In making an RFC determination, the ALJ must weigh all the evidence and make certain that his or her conclusion rests upon clinical examinations as well as medical opinions. *Rodriguez v. Sec'y of Health & Human Servs*., 647 F.2d 28, 224 (1st Cir. 1981).

I will first consider the ALJ's mental RFC finding and then turn to the physical RFC. The ALJ made the following mental RFC determination: Martinez could understand, remember, and execute simple one- or two-step instructions; maintain attention; sustain concentration, persistence, and pace; adapt to changes; and interact adequately with others. Tr. 62. In reaching this conclusion, the ALJ gave great weight to the opinions of state agency consultants, Dr. González, and Inspira records, while offering little weight to Dr. Prieto's opinion, given its inconsistency with other portions of the record. Tr. 66-67. He also considered Martinez's statements regarding her symptoms, finding that her medically determinable impairment could reasonably be expected to cause the alleged symptoms, but that Martinez's statements concerning the intensity, persistence, and limiting effects of those symptoms were not consistent with the medical evidence of record. Tr. 63.

Having thoroughly reviewed the record, I find that substantial evidence supports the ALJ's determination that Martinez retains the capacity to perform simple work. That determination is supported by Inspira treatment records showing that, although Martinez was anxious and depressed, she was generally cooperative, oriented, relevant, coherent, and logical, with adequate judgment, good hygiene, adequate concentration, and no memory changes. Tr. 270, 295, 297, 299. It is also supported by Dr. González's determination that Martinez had average intellectual ability and adequate interpretation capabilities, arithmetic abilities, and social judgment; that she could successfully answer questions testing her general knowledge; and that her memory, attention, and

concentration were slightly diminished. Tr. 159-62. And the opinions of non-examining consulting physicians also support the ALJ's mental RFC determination, as they opined that Martinez could understand, remember, and execute simple one- or two-step instructions; follow simple work procedures; make simple work-related decisions; maintain attention up to two hours at a time; sustain concentration, persistence, and pace; adapt to changes; maintain a regular schedule; use transportation; and interact adequately with others. Tr. 359-60, 370-74. As explained above, Dr. Prieto's opinion could have supported greater limitations. However, in deciding to assign his opinion little weight, the ALJ reasonably resolved a conflict in the evidence. *Rodriguez v. Sec. of Health and Human Services*, 647 F.2d 218, 222 (1st Cir. 1981) ("[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts.").

Further, the ALJ did not err in his assessment of Martinez's subjective statements regarding her mental health symptoms. As Martinez correctly points out, "in assessing the credibility of a claimant's asserted subjective symptoms, the ALJ must consider a series of factors" commonly known as the *Avery* factors. *Kratman v. Barnhart*, 436 F.Supp.2d 300, 308 (D. Mass. 2006) (citing *Avery v. Sec'y of Health and Human Serv.*, 797 F.2d 19, 23 (1st Cir. 1986)). These include the following:

> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
> 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
> 3. Type, dosage, effectiveness, and adverse side effects of any pain medication;
> 4. Treatment, other than medication, for relief of pain;
> 5. Functional restrictions; and
> 6. The claimant's daily activities.

*Avery*, 797 F.2d at 28; *see also* 20 C.F.R. § 404.1529(c) (demonstrating that these and other factors apply not only to "pain" but to "symptoms"). The ALJ, however, "need not slavishly discuss all factors relevant to analysis of a claimant's credibility and complaints of pain in order to make a supportable credibility finding." *Amaral v. Comm'r of Soc. Sec.*, 797 F. Supp. 2d 154, 162 (D. Mass. 2010) (citations omitted); *see also Mercado v. Comm'r of Soc. Sec.*, 767 F. Supp. 2d 278,

285 (D.P.R. 2010) ("Generally, a failure to address all of the *Avery* factors in the rationale of the final decision is cured if the factors are discussed or considered at the administrative hearing."); *Vega v. Astrue*, 2012 WL 5989712, at *8 (D. Mass. Mar. 30, 2012) (*Avery* require[s] a hearing officer to inquire into and consider each *Avery* factor in reaching his determination, but does not . . . require an explicit written analysis of each factor.").

In the instant case, the ALJ considered Martinez's subjective complaints regarding her mental condition alongside the medical evidence and reasonably found that her subjective complaints were partially supported, requiring only limitation to simple work. "[A]lthough the ALJ did not mechanically enumerate each factor, [his] opinion and the transcript of the hearing show a full consideration of the factors." *Madera Colon v. Commr. of Soc. Sec.*, CV 19-1027 (MEL), 2020 WL 5843673, at *5–6 (D.P.R. Sept. 30, 2020) (citation and internal quotation marks omitted). Regarding the first factor, the nature and intensity of symptoms, the ALJ considered Martinez's statements that she could not sleep at night, that she sees things, is bothered by other people, cries, spends her day laying down, does not go out, cannot drive, and suffers from agitation, variable appetite, constant fear, depression, and concentration and memory problems. Tr. 63. He explained, however, that he did not credit the severity of the symptoms Martinez alleged, as they conflicted with opinions offered by Dr. González and state agency consultants as well as Inspira records, which showed intact cognitive functioning and no perceptual disturbances. Tr. 62-67. Regarding the second factor, precipitating and aggravating factors, the ALJ inquired into these factors during the hearing and heard testimony that, when Martinez is with other people, she becomes annoyed and yells at them and that noise makes her lose control. Tr. 93, 96. Again, however, these allegations conflicted with Inspira records, which showed that Martinez was cooperative, and other opinion evidence. Tr. 62-67. Regarding the third factor, related to medication, the ALJ considered Martinez's statements that her medications do not help and make her sleepy, but he also noted that treatment records do not generally show side effects from medications. Tr. 62-63, 67. Further, notes from the Center for Access and Treatment showed that Martinez's symptoms improved with treatment. Tr. 65. Regarding the fourth factor, treatment other

than medication, the ALJ considered Ramirez's partial hospitalization, which included psychotherapy, and noted that her symptoms improved with that hospitalization. Tr. 65. The ALJ also considered the fifth factor, functional restrictions, acknowledging Martinez's reports of disabling symptoms of depression, insomnia, and anxiety, including her inability to concentrate, follow instructions, or get along with others, but he explained why these statements were inconsistent with the evidence from Inspira, Dr. González, and the state agency consultants. Tr. 62-67. Finally, the ALJ considered Martinez's daily activities, noting her testimony that she spent most of the day laying down, had no hobbies, relied on family to do household chores, and never went out unless someone took her to appointments. *Id.* Again, however, these statements were inconsistent with other portions of the record, including Dr. González's finding that Martinez could go through basic daily activities like preparing food and self-care with occasional help from family and that she could handle her own funds. *Id.*

In short, although the ALJ did not expressly name each of the *Avery* factors in evaluating Martinez's mental impairment, his decision and the hearing transcript show that he considered them. Further, he provided reasonable explanations for partially crediting Martinez's self-reports given other inconsistent record evidence. *See* 20 C.F.R. § 404.1529(c) (A claimant's "symptoms, including pain, will be determined to diminish [his or her] capacity for basic work activities to the extent that [his or her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence."). For the above reasons, the ALJ's mental RFC determination is supported by substantial evidence.

Turning to physical limitations, the ALJ determined that Martinez had the RFC to perform a full range of work at all exertional levels. In reaching this conclusion, he considered treatment records, diagnostic findings, and opinion evidence, assigning great weight to the opinions of state agency consultants. The ALJ reasoned that Martinez was physically unrestricted because records from Dr. Nieves consistently showed vital signs within normal limits and did not provide range of motion findings, sensory findings, motor strength findings, or deep tendon reflex findings to

support a disabling impairment; state agency consultants opined that Martinez did not have a medically determinable impairment or any physical limitations; and diagnostic findings did not show any significant condition to support a severe medically determinable impairment. Tr. 63-64, 67. He also referred to another physical examination, the results of which he described as unremarkable, Tr. 63, although I find this document largely illegible, Tr. 695.

Upon review of the record, I find that the ALJ's physical RFC determination is not supported by substantial evidence. In assessing RFC, "the ALJ must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Dias v. Colvin*, 52 F. Supp. 3d 270, 281 (D. Mass. 2014) (quoting Social Security Ruling 96–8P, 1996 WL 374184, at *5 (July 2, 1996)) (internal quotation marks omitted). Further, when measuring a claimant's capabilities, "an expert's RFC evaluation is ordinarily essential unless the extent of functional loss, and its effect on job performance, would be apparent even to a lay person." *Santiago v. Sec'y of Health & Human Servs.*, 944 F.2d at 7 (1st Cir. 1991). The reason for requiring an expert's RFC assessment is that generally, "an ALJ, as a lay person, is not qualified to interpret raw data in a medical record." *Manso–Pizarro*, 76 F.3d at 17 (per curiam); *see also Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990) (per curiam) ("[S]ince bare medical findings are unintelligible to a lay person in terms of residual functional capacity, the ALJ is not qualified to assess residual functional capacity based on a bare medical record."). "This principle does not mean, however, that the [Commissioner] is precluded from rendering common-sense judgments about functional capacity based on medical findings, as long as the [Commissioner] does not overstep the bounds of a lay person's competence and render a medical judgment." *Gordils*, 921 F.2d at 329.

Here, the ALJ's RFC determination rests to a large degree on the opinions of non-examining state agency consultants. But these consultants considered only two of Martinez's physical impairments—hypertension and hyperlipidemia—finding that, in the absence of evidence of major cardiovascular complications or organ damage, these did not cause anything beyond minimal limitation. Tr. 355, 369. It appears they did not consider any of Martinez's other alleged

impairments, including muscle spasms, gastrointestinal or abdominal pain, diverticulosis, internal hemorrhoids, and neck and upper trapezius pain. Tr. 58. And the treatment records generally do not usefully translate these impairments into functional terms. *See Rosado*, 807 F.2d at 293–94 (explaining that medical findings in the record that merely diagnosed exertional impairment without relating those diagnoses to specific residual functional capabilities were "unintelligible to a lay person in terms of residual functional capacity").

Moreover, the state agency consultants formed their opinions in March and July of 2015, but a fair amount of evidence was added to the record after that time. A colonoscopy showed non-bleeding diverticula, melanosis, internal hemorrhoids, and two sessile non-bleeding polyps. Tr. 279, 282. An abdominal-pelvic CT scan showed right lower quadrant anterior abdominal wall defect with herniated small bowel loops; nonspecific colonic wall thickening of the splenic flexure accentuated by underdistension; small hiatal hernia; mild spondylosis; status post hysterectomy; and bibasilar subsegmental atelectatic changes. Tr. 605-06. A pelvic ultrasound showed a right lower quadrant anterior abdominal wall hernia. Tr. 660. A tissue examination report revealed an abdominal wall herniorrhaphy and hernia sac. Tr. 664. And Martinez was diagnosed with ventral incisional hernia and underwent a ventral hernia repair followed by infection. Tr. 664, 701-04.

Additionally, a thyroid ultrasound showed a small cyst in the right aspect of the isthmus and a mildly enlarged right thyroid lobe. Tr. 316, 727. X-rays of Martinez's feet showed osteoarthritis and mild left hammertoe deformities, and x-rays of her hands and wrists showed osteoarthritis and mild bilateral negative ulnar variance. Tr. 663. A cervical spine x-ray showed muscle spasm, osteoarthritis, and discogenic disease, Tr. 754, and a lumbar spine x-ray showed mild osteoarthritis. Tr. 755. Further, Martinez began seeing a physiatrist and physical therapist for neck and upper trapezius pain. Tr. 349, 762.

Because the state agency consultants never reviewed this evidence and because treatment records provide little insight into functional limitation, the ALJ had nothing but his lay opinion on which to rely when he concluded that the above-named evidence indicated only minimal limitations. But as lay persons, neither I nor the ALJ can glean much from these records regarding

the precise extent of Martinez's physical limitations. Commonsense does not tell me how often someone with muscle spasm, osteoarthritis, and discogenic disease in the cervical spine who is pursuing related physical therapy and taking Relafen and Flexeril can bend her neck or lift her arms above the shoulders. *See* Tr. 89-90, 754, 762-63. Nor does it tell me whether someone with x-ray findings of osteoarthritis and mild bilateral negative ulnar variance in the hands and wrists might be limited in her ability to manipulate small objects. Tr. 89-90, 663. Nor can I know based on commonsense that someone with diverticula, herniated small bowel loops, and bibasilar subsegmental atelectatic changes who has undergone a ventral hernia repair might experience ongoing abdominal pain in a manner that limits her movement. Tr. 279, 282, 605-06, 664, 701-04. And I certainly cannot determine whether and how these findings might affect Martinez's functioning insofar as they might interact with her depression. To reasonably answer questions such as these, the ALJ needed to hear from a medical expert. *See Rogers v. Commr. of Soc. Sec*., CIV.A. 13-10196-JGD, 2014 WL 1334173, at *13 (D. Mass. Mar. 28, 2014) (finding remand necessary so "all of the relevant laboratory data may be reviewed by a medical expert"); *see also Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017) (explaining that an ALJ could not permissibly rely "on his own interpretation of what 'no acute distress' and 'normal movement of all extremities' meant in terms of [a claimant's] RFC").

Because the ALJ impermissibly interpreted raw medical data in assessing Martinez's physical RFC, his physical RFC determination is not supported by substantial evidence. [5] Accordingly, the Commissioner has not met his burden at step five to show that there are "specific jobs in the national economy that the applicant can still perform." *Seavey v. Barnhart*, 276 F.3d 1, 5 (1st Cir. 2001); *see Staples v. Astrue*, Civ. No. 09–440–P–S, 2010 WL 2680527, *5–7 (D.Me. June 29, 2010) (Rich, Mag. J., Report and Recommended Decision, aff'd without obj.) (reasoning

---

[5] In light of the above analysis, I also question the ALJ's determination at step two that Martinez does not have a severe physical impairment of any kind. However, I need not reach this issue as Martinez has not raised it in her memorandum of law. Nonetheless, the ALJ should, if appropriate, revisit this question on remand.

that the absence of substantial evidence in support of a step four RFC finding undermines the Commissioner's ability to carry his step five burden). A remand is in order.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **VACATED** and **REMANDED** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 31st day of March, 2021.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge